UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
United States of America                              :
                                                      :
                                                      :
                    v.                                :          No. 07-CR-50-01 (PAC)
                                                      :
Patrick Kalonji                                       :
                                                      :
                            Defendant                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x


**DEFENDANT PATRICK KALONJI'S SENTENCING MEMORANDUM**

**DLA PIPER LLP (US)**
**Patrick J. Smith**
**Corey E. Delaney**
**Chandana T. Ravindranath**
**1251 Avenue of the Americas**
**New York, NY 10020**
**(212) 335-4500**

*Attorneys for Defendant Patrick Kalonji*

# TABLE OF CONTENTS

**Page**

Preliminary Statement .................................................................................................. 1

Procedural Background ................................................................................................ 3

The Offense Conduct .................................................................................................. 3

Argument ..................................................................................................................... 4

I.  The Adjusted Offense Level Should Be Eleven .................................................. 4

    A.  The Offense Level Should Be Increased by Only Six Levels Based Upon the Loss Amount ........................................................................................ 4

    B.  The Offense Level Should ot Be Increased for Number of Victims ...................... 7

    C.  The Offense Level Should Not Be Increased for Commission Outside of the United States ................................................................................... 7

    D.  The Offense Level Should Be Reduced Two Levels for Minor Role ................... 8

    E.  The Adjusted Offense Level Is 11 ....................................................... 9

II.  Consideration of the Sentencing Factors Under §3553(a) Should Cause the Court to Sentence Mr. Kalonji with Mercy and Len ................................................. 9

    A.  Applicable Legal Standard ..................................................................... 9

    B.  Analysis of § 3553(a) Factors to Mr. Kalonji ........................................ 11

        1.  Nature and Circumstances of the Offense ........................................ 11

        2.  The History and Characteristics of the Defendant ............................ 13

        3.  The Need for the Sentence Imposed ................................................. 16

            a.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense ................. 17

            b.  To Afford Adequate Deterrence ................................................... 17

            c.  The need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant .......................................... 18

    C.  The Court Should Find that a Lesser Sentence Avoids Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct ................................................ 19

Conclusion ................................................................................................................ 21

i

**Preliminary Statement**

The government's view of the offense conduct in this case has led the Probation Department to take positions in the Presentence Report that grossly exaggerate the loss amounts and distort Patrick Kalonji's role in offense.  As we explain below, the data upon which the government and the Probation Department rely leads to several fundamental errors in computing Mr. Kalonji's offense level.  First, the total loss fairly attributable to Mr. Kalonji is no more than $43,180.58.  The government's position on loss is wildly speculative and inconsistent with the Guidelines definition of loss as a concept.  Second, there were less than ten "victims" that may be attributed to Mr. Kalonji because only victims who suffered <u>actual</u> loss count for purposes of U.S.S.G §2B1.1(b)(2)(B).  Third, while some of the offense conduct took place in a foreign country, it was not the sort of conduct that targeted U.S. victims by reaching across the border and U.S.S.G. §2B1.1(b)(9) is therefore inapplicable.  Finally, Mr. Kalonji played a minor role in the scheme and thus deserves the benefit of a two-level downward adjustment under U.S.S.G. §3B1.2(b).

Based upon these objections to the PSR, the appropriate adjusted offense level under the sentencing guidelines should be 11, reached as follows: a base level of 7, which should be increased by 6 based upon a total loss amount of $43,180.58; there should be a 2 level increase because the offense involved "the trafficking in unauthorized access devices or authentication features"; a 2 level reduction is warranted for Mr. Kalonji's minor role; and a 2 level reduction should be awarded for Mr. Kalonji's acceptance of responsibility.  In criminal history category I, an offense of 11 calls for a guidelines range of eight to fourteen months.

In this case, several factors strongly indicate that even this reduced guidelines range still substantially overstates both the seriousness of Mr. Kalonji's role in the offense and the risk

assessment of Mr. Kalonji. First, Mr. Kalonji has overcome substantial adversity and persecution in his home country of the Congo to lead a life of education, gainful employment, and public service. After fleeing from the Congo to Costa Rica following the politically motivated murder of his uncle and the threat of his own death, Mr. Kalonji met Lanre Elekede, a co-conspirator and the architect of the criminal plan here, who exploited Mr. Kalonji's vulnerability for his own monetary gain. Mr. Kalonji's participation was limited and brief; indeed, in the four years between the time the offense conduct ended and his arrest, Mr. Kalonji emigrated to Canada, where he established himself as a valuable and penitent member of society. He is simply not an offender who needs to spend a significant amount of additional time in prison to safeguard society. Second, Mr. Kalonji's role was no more significant than that of his co-conspirator, Mr. Abiodun Wahab, who was sentenced to a prison sentence of twelve months and one day. Since Mr. Kalonji's role was the same as that of Mr. Wahab, a harsher sentence should not be imposed. Further, Mr. Kalonji should be sentenced to a prison sentence significantly shorter than Elekede, who was the mastermind of the conspiracy and who was sentenced to 34 months.

Mr. Kalonji accepts full responsibility for his actions and knows that in forwarding credit card information via email, he broke the law. However, both the facts and circumstances of this offense warrant a sentence below that recommended by the Probation Department. For these reasons, as discussed more fully below, we respectfully request that the Court impose a sentence of time served (approximately eight months). This sentence would appropriately address the core sentencing factors set forth in 18 U.S.C. §3553(a) and would be entirely reasonable under all circumstances present here.

2

## Procedural Background

Mr. Kalonji was charged in a one count indictment: Count One charged that Mr. Kalonji , with others known and unknown, conspired to commit wire fraud and bank fraud between July 23, 2002 and August 18, 2004, in violation of 18 U.S.C. §§1343 and 1344.  Mr. Kalonji was arrested on June 23, 2008.  On September 18, 2008, Mr. Kalonji appeared before Honorable Paul A. Crotty and pleaded guilty as charged.

The PSR agreed with the Guidelines stipulations set forth in the government's Pimentel letter and calls for an adjusted offense level of 26.  (PSR ¶69)  Under this analysis, Mr. Kalonji received a 14-level adjustment for loss amount pursuant to U.S.S.C. §2B1.1(b)(1)(H) (PSR ¶58), a four-level adjustment for victims pursuant to U.S.S.C. §2B1.1(b)(2)(B) (PSR ¶59), a two-level adjustment because a "substantial part of the scheme was committed from outside of the U.S." pursuant to U.S.S.C. §2B1.1(b)(9)(B) (PSR ¶60), and a two-level adjustment because the "offense involved the possession and use of authentication features and the trafficking in unauthorized access devices or authentication features" pursuant to U.S.S.C. §2B1.1(b)(10) (PSR ¶61).  Mr. Kalonji received a three level reduction for acceptance of responsibility pursuant to U.S.S.G. §3E1.1(a) and (b) (PSR ¶66).  Mr. Kalonji has no criminal convictions and a Criminal History Category of I.  Thus, the applicable guidelines range found in the PSR is 63 to 78 months imprisonment.  (PSR pg. 23).  The Probation Office recommends the lowest sentence of 63 months.  *Id.*

## The Offense Conduct

While living in Costa Rica, Mr. Kalonji was employed by BetOnSports.com, an online company that enabled customers to place wagers on numerous sporting events over the internet. Mr. Kalonji worked in customer service, which gave him access to customers' private

3

information, including their credit card numbers. Mr. Kalonji kept a link to the internal website

for BetOnSports.com in an email in the in-box of his personal account because the account

through which he was supposed to save the information was long and complicated. He saved it

to his email for ease of access. Mr. Kalonji learned that Lanre Elekede was accessing Mr.

Kalonji's email accounts and using this link to access the BetOnSports.com customers' credit

card information and forward it via email. Mr. Kalonji had provided Mr. Elekede, who had

befriended him, his email login information so that Mr. Elekede could check his email for him at

the internet café. Mr. Kalonji inquired on at least two occasions as to what Mr. Elekede was

doing with this information. The first time, Mr. Elekede responded that it was none of Mr.

Kalonji's business. The second time, Mr. Elekede stated that he was selling the information.

Mr. Kalonji acquiesced and allowed Mr. Elekede to continue to forward these emails, and further

agreed to forward credit card information to Mr. Elekede. During this period, approximately

fourteen emails were sent from Mr. Kalonji's email accounts, some of which were sent by Mr.

Elekede when he accessed Mr. Kalonji's accounts, while others were sent by Mr. Kalonji,

himself. When Mr. Kalonji relocated to Canada, he changed his email passwords so that Mr.

Elekede could no longer access the link.

### Argument

**I.      The Adjusted Offense Level Should Be Eleven**

> **A.      The Offense Level Should Be Increased by Only Six Levels Based Upon the Loss Amount**

The offense level should be increased by only six levels because the loss is more than

$30,000, but less than $70,000. U.S.S.G. §2B1.1(b)(D). A maximum loss of approximately

$43,180.58 should be attributed to Mr. Kalonji. The rationale for this calculation is that it is the

same as that employed by Honorable Richard Berman in sentencing co-conspirator Lanre

Elekede: Judge Berman calculated the loss amount by looking at the credit cards or access devices found in emails included at Mr. Elekede's personal email accounts. (A copy of Mr. Elekede's sentencing transcript is attached as Exhibit B). Mr. Kalonji, likewise, is responsible for the loss only of those credit cards or access devices found in his e-mails. The government has produced a total of 14 e-mails from the two personal accounts attributed to Mr. Kalonji in the indictment and the PSR, on account of which the government can claim that there were sixty-seven access devices. (The emails are attached as Exhibit C).

According to the Guidelines, the greater of the actual or intended loss or $500 per access device is totaled. U.S.S.G. §2B1.1, comments (n.3(A) and (F)). "Actual loss" is the "reasonably foreseeable pecuniary harm that resulted from the offense," while "intended loss" is the "pecuniary harm that was intended to result from the offense." U.S.S.G. §2B1.1, comments (n.3(A)(i) and (ii)). "Intended loss" is not simply "potential loss," and the "court errs when it simply equates potential loss with intended loss without deeper analysis." *United States v. Geevers*, 226 F.3d 186, 192 (3d Cir. 2000).

The government does not adhere to these straightforward concepts in its loss calculation table and consequently grossly overstates the loss that is attributable to Mr. Kalonji, even when limited to his emails. (The Government's Loss Calculation Table can be found at Exhibit D). The loss chart is set up as follows:

| Name | Social | Credit | Bank Account | Access Device Total | Actual/Att Charges | Credit Limit/Funds Avail | Loss | Source |
|------|--------|--------|--------------|---------------------|--------------------|--------------------------|------|--------|
|      |        |        |              |                     |                    |                          |      |        |

Each victim is listed by name. "Social," "credit," and "bank account" are the various access devices that are added up for the "access device total." "Actual/Att[empted Charges" are not listed for every victim, neither are "Credit Limit/Funds Avail[able]." A loss amount is given for

every victim, as is a source.  Many of the government's individual calculated losses, however, are unsubstantiated and misleading.  For example:

| Name | Social | Credit | Bank Account | Access Device Total | Actual/Att. Charges | Credit Limit/Funds Avail | Loss | Source |
|------|--------|--------|--------------|---------------------|---------------------|--------------------------|------|--------|
| Ind. 6 | 0 | 3 | 0 | 3 | $110 | $1000 | $2000 | Just Pins |

A Guidelines calculation dictates that we take the greater of the loss amount or $500 per access device.  Loss amount is the greater of either the actual or intended – *not potential* – loss.  The government has put forth no evidence on which the court can base any level of analysis, not to mention the "deeper analysis" required by *Geevers*, that the intended loss was the available credit limit.  In most cases, where a credit limit was available, there was an actual or attempted charge that was only a percentage of the limit.  Regardless, because there were three access devices here, the loss should be calculated as $1500 – which is the greatest of the actual ($110), intended (arguably $1000), or per device (3 * $500) loss.  And yet, the government inexplicably comes up with a completely unfounded loss of $2000.  The chart is riddled with these figures that are seemingly pulled from the air.

Instead, the correct approach is to take the higher of the actual/attempted loss amounts, the "intended" loss amount, or the $500 per access device for each email that can be tied to Mr. Kalonji's personal email accounts.  Based on this reasoned and accredited method, a Guidelines calculation results in an estimated maximum total loss of $43,180.58.  There is no basis for increasing the loss total beyond this amount.  In fact, this amount is still grossly overestimated because Mr. Kalonji did not send every email from his personal account that contained the misappropriated information, *see Infra* Section II.B.1.

6

**B.    The Offense Level Should Not Be Increased for Number of Victims**

The number of victims affected by Mr. Kalonji's conduct was less than ten. Therefore, there is no increase pursuant to §2B1.1(b)(2)(B), which requires a minimum of ten victims for an enhancement. The Guidelines define "victim," in pertinent part, as a "person who sustained any part of the *actual loss* determined under subsection (b)(1)." U.S.S.G. §2B1.1 Application Note 1. The government has identified only eight individuals that *potentially* suffered actual loss – the individual loss was identified by the government as either "actual" or "attempted" - that may be attributed to Mr. Kalonji through his emails. The evidence that the government has produced fails to show that any other individual for whom Mr. Kalonji may be held responsible sustained any actual loss; the government's argument that the offense involved 50 or more victims, but fewer than 250 victims, is a gross overestimation because those individuals either cannot be tied to Mr. Kalonji or did not all suffer *actual loss.*

**C.    The Offense Level Should Not Be Increased for Commission Outside of the United States**

An enhancement for the commission of a substantial part of the fraudulent scheme from outside of the United State under U.S.S.G. §2B1.1(b)(9) is unwarranted. This enhancement was created to punish off-shore telemarketing fraud or the use of off-shore accounts to further the scheme or avoid taxation. U.S.S.G. App. C, Amend 577. *See U.S. v. Kostakis*, 364 F.3d 45 (2d Cir. 2004) (discussing the E.D.N.Y's decision to depart downwards because U.S.S.G. §2B1.1(b)(9) requires "sophisticated" conduct, such as telemarketing, but reserving decision on district court's analysis until facts had been developed further).

Further, the Guidelines advise that this enhancement is applied based on the overall offense conduct, not on the personal conduct of the defendant. U.S.S.G. App. C, Amend 577. Other than forwarding a handful of emails from his personal email account while outside of the

United States, there is no known evidence that any other part of the fraud was committed outside of the United States. In fact, Mr. Elekede, the "major player" in the fraud, was not even given this enhancement. There is simply no basis to find that Mr. Kalonji committed the offense "in substantial part" outside of the United States when no such finding was made for the other individuals involved in the fraud and the enhancement is dependent on the overall offense conduct.

**D.     The Offense Level Should Be Reduced Two Levels for Minor Role**

Mr. Kalonji's limited role in the fraud, especially in light of the conduct of Mr. Elekede, who conceived, directed, and executed the fraud, warrants a two-level reduction for minor role in the offense. In its sentencing argument for Mr. Elekede, the government identified Mr. Elekede as a "major, hands-on player in the identify theft ring, responsible for stealing the identities of at least 175 individuals," having organized a ring of individuals to steal information and purchased a large number of telephone calling cards with the stolen information. Mr. Kalonji stands in stark contrast. Mr. Kalonji did not propose the fraud, nor was he involved in its development. He discovered what Mr. Elekede was doing and chose to participate out of loyalty to Mr. Elekede and fear that he would be injured or killed if he told authorities about the fraud. He received no remuneration. Mr. Kalonji only forwarded a handful of emails containing personal information and withdrew from the scheme by changing his email password when he realized the severity of what he was doing. Mr. Kalonji's role, in fact, is more similar to that of Abiodun Wahab, an associate of Mr. Elekede, whom the government says "helped the scheme by using his e-mail address to pass on stolen identity information to other ring members." The government recognized that Mr. Wahab had "a relatively limited role in the scheme." Mr. Kalonji's similarly limited role in this matter, which was conceived, directed and carried-through

8

by others, qualifies him as a minor participant in the offense, entitled to a two-level reduction under §3B1.2(b).

### E.     The Adjusted Offense Level Is 11

Taking into account the guidelines factors argued above, the adjusted offense level should be 11. In Criminal History category I, the applicable sentencing range is eight to fourteen months. The Court should impose a sentence under 18 U.S.C. Section 3553(a) against the background of this Guidelines analysis. In the event that the Court arrives at a higher level, Application Note 19(c) of the U.S.S.G. §2B1.1 provides for a downward departure where "the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." The enhancement for loss, at any higher level, would substantially overstate the "moral seriousness" of Mr. Kalonji's offense conduct. It must be remembered that Mr. Kalonji only forwarded a handful of emails with no intention of financial gain. Indeed, "in many cases … the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *U.S. v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004). For these reasons, should the Court find that the loss is higher than $43,180.58, the Court should nonetheless depart downward to an adjusted offense level of eleven.

### II.    <u>Consideration of the Sentencing Factors Under §3553(a) Should Cause the Court to Sentence Mr. Kalonji with Mercy and Lenity</u>

### A.     Applicable Legal Standard

In accordance with the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005) and the Second Circuit's decision in *United States v. Brown*, 514 F.3d 256, 263 (2d Cir. 2008), the sentence to be imposed must be determined by the factors set forth in 18 U.S.C.

§3553(a), including the advisory Sentencing Guidelines established by the United States

Sentencing Commission.  Thus, in imposing a sentence, the Court must consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed—

>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>> (B) to afford adequate deterrence to criminal conduct;

>> (C) to protect the public from further crimes of the defendant; and

>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> (3) the kinds of sentences available;

> (4) the kinds of sentence and the sentencing range established for—

>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

> (5) any pertinent policy statement . . . [issued by Sentencing Commission];

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(a).  A sentencing judge may find all the facts appropriate for determining a

sentence, as long as the judge is aware of "both the statutory requirements and the sentencing

range or ranges that are arguably applicable." *Brown*, 514 F.3d at 264.  As long as the judge

considers the advisory guidelines, he may determine a sentence that is outside of that range.

Weighing all the factors delineated in §3553(a), we respectfully suggest that leniency is

appropriate here and that a sentence below the Guidelines range will punish, deter and provide

justice in this case.  Prior to this conviction, and despite being a victim of brutality and

persecution, Mr. Kalonji was a law abiding citizen and a model for his friends, family and acquaintances.

As outlined below, several of the most relevant §3553(a) factors indicate that a sentence outside the Guidelines range will serve the ends of justice while punishing Mr. Kalonji appropriately for his participation in the offense. Indeed, weighing the circumstances surrounding Mr. Kalonji's offense and his history and characteristics against the objectives of sentencing, leniency at sentencing is warranted. We respectfully request that the Court exercise its discretion to impose a non-guidelines sentence.

**B.      Analysis of § 3553(a) Factors to Mr. Kalonji**

**1.      Nature and Circumstances of the Offense**

As the Court is aware, Mr. Kalonji was charged and pled guilty to a one-count indictment for conspiracy to commit wire fraud and bank fraud. Mr. Kalonji acknowledges that this behavior was wrong and against the law. However, Mr. Kalonji did not engage in these actions for a monetary or any other gain. He entered into this conspiracy out of a sense of misplaced loyalty and fear.

After fleeing from the Congo to avoid persecution in 2000, Mr. Kalonji arrived in Costa Rica destitute, scared, and alone. He did not know anyone and was desperate to find a job and a surrogate family that he could trust. Unfortunately, he fell into a trap and was tricked into trusting someone who only wanted to take advantage of him. In his letter to Your Honor, Mr. Kalonji encapsulates his experience with Lanre Elekede:

> Prior to the offense, I was unemployed and homeless when Lanre Elekede was the only person that made the effort to assist me in my time of need. Lanre let me live with him rent-free, and he paid for numerous other expenses including my food. Lanre truly treated me like a family member. This assistance was heartfelt and was a significant factor in my decision to assist Lanre in obtaining the personal and credit cards information for the clients of BetOnSports.

Ex. A.

As Mr. Kalonji explains, his misplaced loyalties fueled the desire to help Mr. Elekede, and as a result, he agreed to assist Mr. Elekede steal credit card information. Ex. A. Mr. Kalonji understood then and understands now that the choices he made were wrong, and that he violated the law, but his desire to "pay back" Mr. Elekede for the help he extended compromised his lifelong sense of right and wrong. As he wrote the to the Court:

> I understand that these activities were wrong and against the law. I have never felt right about what I did; it was a mistake that I just wanted to forget about. Since that time (late 2004) I began to distance myself from Lanre.

Ex. A. Upon fleeing to Costa Rica, Mr. Kalonji was desperate to find a job and to send money back to his family in the Congo. Mr. Kalonji had the unfortunate luck of meeting Lanre Elekede through an acquaintance. At this time, Mr. Kalonji was living in a church shelter and was unemployed. Since Mr. Kalonji did not know anyone else and still did not speak the local language, he and Mr. Elekede became close. Mr. Elekede, also from Africa, became a source of comfort and familiarity, a connection for Mr. Kalonji to the life he was forced to abandon. Moreover, Mr. Elekede provided Mr. Kalonji with shelter and food and became almost like family to Mr. Kalonji. *See* Ex. A. As a manifestation of his trust, Mr. Kalonji gave Mr. Elekede access to his personal and email accounts and often asked Mr. Elekede to check his email when he went to internet cafes. When Mr. Kalonji found out that Mr. Elekede was accessing the BetOnSports.com link through his email, he responded with genuine, albeit misplaced, loyalty to the man who had enabled him to start his life again.

Aside from the extreme loyalty Mr. Kalonji felt for Mr. Elekede, he was also fearful of reporting the activities to either law enforcement or his employer. In his home country, the authorities were not to be trusted, as they victimized innocent and helpless citizens. As a result

of years of persecution and the murder of his uncle, this mistrust and terror of authorities was firmly embedded in Mr. Kalonji's mind. Moreover, Mr. Kalonji feared BetOnSports.com owner, Gary Kaplan. Kaplan was known to carry a concealed firearm and had a reputation for disciplining his employees with violence. Mr. Kalonji is personally familiar with violence – having grown up in the Congo, he has seen friends and family members maimed and murdered for their political beliefs – and he knows an individual's capacity to justify violence. Mr. Kalonji feared that he would be seriously injured or killed if he told Mr. Kaplan what he and Mr. Elekede had done. The Court should consider the nature and circumstances of the offense, and consider the reasons Mr. Kalonji had for involving himself in the fraud ring, and therefore grant him a lenient sentence.

### 2. The History and Characteristics of the Defendant

This conviction is Mr. Kalonji's first encounter with the criminal justice system and will undoubtedly be his last. Before his arrest in this case, Mr. Kalonji escaped from the Democratic Republic of Congo where he was a victim of persecution and fled to Costa Rica. Mr. Kalonji appreciates that his offense was wrong and unlawful. He accepts responsibility for his wrongdoing and realizes the impact that his offense had on his victims.

In 1981, Mr. Kalonji was born to Rose Kabena Mosuaba Nsoki and Zacharie Kalonji Ngoyi. Zacharie, however, abandoned Rose when she was five months pregnant with Mr. Kalonji to return to his previous wife. Thereafter, Rose relocated to Likasi, an area in the Katanga province of the Democratic Republic of the Congo, where Mr. Kalonji was born. When Mr. Kalonji was three years old, his mother brought him to Kinshasa, the capital of the Democratic Republic of the Congo, to live with his aunt, Pelagie, whom Mr. Kalonji considers to

be a mother figure. Pelagie raised Mr. Kalonji until the beginning of his last year of primary school (elementary school), when Mr. Kalonji relocated to live with his father for over a year.

While attending secondary school, Mr. Kalonji resided between the homes of Pelagie and an uncle. When he left school in 1998, he moved in permanently with his uncle, who was a member of "Bundu Dia Kongo," a socio-political movement that advocates for the establishment of a federal government system while seeking to eradicate social and economic injustices long imposed by the government. This organization is strongly rejected by the Democratic Republic of the Congo's government because it promotes the separation of the Kongo Central Province (formerly the Bas-Congo Province) from the rest of the country – it was banned by the government in March 2008. Mr. Kalonji became an active member in the organization's youth group after moving in with his uncle. The Bundu Dia Kongo members have been subject to repeated and systematic human rights abuses for nearly the past ten years. Demonstrators and civilians have been beaten, subjected to degrading treatment, tied up and dragged behind cars, and killed, among a vast array of other mistreatment. Around 2000, police officials began raids, arresting, and kidnapping members of the Bundu Dia Kongo. Mr. Kalonji's uncle was kidnapped and murdered, seemingly by government officials. Following the murder, government officials subjected Mr. Kalonji to numerous threats for his association with the organization. Fearing for his life, Mr. Kalonji managed to flee from the Congo to Costa Rica.

In 2004, Mr. Kalonji sought refuge in Canada where he began to take classes toward his high school diploma and seek jobs to support himself. From 2004 to 2005, Mr. Kalonji worked for a call center in Toronto, Canada. From 2005 until 2006, Mr. Kalonji worked at a telemarketer for Household Financial located in Toronto, Canada, and from 2006 until 2007, Mr. Kalonji worked at Institution Technology, located in Edmonton, Canada. In May 2008, Mr.

14

Kalonji obtained his high school diploma and thereafter worked until his arrest at Nabors

Production Services, an oil field company located in Alberta, Canada.  *See* Ex. I.

 In addition to his employment, Mr. Kalonji also acquired a credit card for the first time

when he moved to Canada and gained an understanding of the responsibilities and concerns of a

credit card owner.  After truly gaining an appreciation and understanding of what a credit card

meant to someone, he immediately changed his password so that Mr. Elekede could no longer

access the customer information in his personal email account.

 Moreover, Mr. Kalonji has always been an extremely caring and passionate person.  Mr.

Kalonji volunteered at the Sojourn House in Toronto, which is a charitable organization that

provides shelter and meals to homeless people in the community.  *See* Ex. A.  Additionally, Mr.

Kalonji plays a pivotal role in helping his family through difficult times.  Delphin Lofunge, Mr.

Kalonji's cousin, writes: "Patrick has always been someone who has often attended our family . .

. [and has a] willingness to help the family by playing the role of a mediator in conflict

situations, and encouraging those who wish to succeed in the Future."  Ex. E.  Mr. Kalonji

regularly sent money to his family in the Congo and paid for his three stepsisters' education.

 Further, Mr. Kalonji does his best to offer assistance to whomever needs it whenever

possible.  As Rodney Thomas, a fellow inmate at Metropolitan Correction Center who has been

blind since 2002 writes: "[I] would have not been able to stay in contact with [my] family, and

follow up on legal issues without Mr. Kalonji's assistance . . . I have no doubt in my mind that

everything that Mr. Kalonji has done for me, have [sic] been out of the kindness of his heart."

Ex. G.  Mr. Kalonji has also attempted to better himself while held at MCC.  As Michael

O'Hara, supervising Chaplain of the prison states, "I believe that he is sincere in the practice of

his faith and is genuine in his efforts to better himself."  Ex. H.  Mr. Kalonji has formed a bible-

study group in his unit of 96 inmates, which is regularly attended by 20 to 30 fellow inmates. Aside from being an outlet to develop and share his faith, Mr. Kalonji's bible-group has significantly reduced theft and violence on his unit. Mr. Kalonji has been told by unit guards and the unit psychologist that the unit has been "quiet" since his efforts began. This has inspired Mr. Kalonji to develop a faith based support group for former inmates which he will form when he is released. He also intends on spending time as a missionary, perhaps in Senegal, before building a construction company that will hire former inmates. Mr. Kalonji's true nature – that of a caretaker and not a criminal – is made clear by his view of his incarceration as an "amazing" experience because of the opportunity it has given him to help those around him.

Mr. Kalonji's past history has clearly played a role in his illegal activities. Hailing from a country where he and his family were persecuted, he was desperate to find someone to trust. Mr. Elekede consequently took full advantage of Mr. Kalonji's vulnerability. Moreover, his fear of authority coupled with the violent reputation of his boss prevented him for coming forward. However, once he gained a true appreciation of the consequences of his crime, Mr. Kalonji changed his password to prevent any further theft and cooperated fully with the government. He has repented for his actions and will not repeat them or any other illegal activity.

### 3.     The Need for the Sentence Imposed

Section 3553(a)(2) also calls for the Court to contemplate various sentencing objectives such as the need to provide punishment for the offense; the need to afford adequate deterrence to criminal conduct; and the need to protect the public from further crimes of Mr. Kalonji. Applying these factors to Mr. Kalonji and the offense to which he pled guilty, and especially considering Mr. Kalonji's history and characteristics, the Court should be merciful in sentencing Mr. Kalonji.

16

a.   **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

Mr. Kalonji accepts full responsibility for his involvement in the theft ring. He stands before the Court as a man who has learned the price of illegality, an appreciation and admittance that what he did was wrong, as well as the value of life.

Mr. Kalonji's involvement was extremely limited in scope. He was not a central part of the scheme as alleged by the government: Mr. Kalonji did not propose the fraud, nor was he involved in its development – he discovered what Mr. Elekede was doing and chose to participate out of loyalty to Mr. Elekede and fear that he would be killed or injured if he told the authorities. Moreover, Mr. Kalonji received no monetary benefit from the scheme. Mr. Kalonji only forwarded a handful of emails containing personal information and later withdrew from the scheme by changing his email password when he comprehended the severity of what he was doing. Mr. Kalonji was not only not involved in Mr. Elekede's scheme to use the misappropriated information to buy phone cards, but had absolutely no knowledge of the scheme whatsoever. As previously stated, Mr. Kalonji did not have a developed understanding of credit card use and could not have fully appreciated the foreseeable consequences of allowing Mr. Elekede access to the customer information. Mr. Kalonji therefore respectfully requests a sentence that reflects his limited role in the theft ring.

b.   **To Afford Adequate Deterrence**

Section 3553(a)(2)(B) asks how the sentence imposed by the Court will deter others from similar crimes. We respectfully submit that a lenient sentence will no doubt deter not only those contemplating similar conduct, but more egregious conduct as well. Mr. Kalonji received no monetary gain from his participation in the crime; he only forwarded emails out of a misplaced

17

sense of loyalty and fear. Having had such an extremely limited role in the offense and having no gain for his participation, any prison time will make an example of Mr. Kalonji. Imprisonment for any length of time for forwarding emails is an extremely strong deterrent for anyone who would consider involvement in such a theft ring.

**c.    The need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant**

Mr. Kalonji has learned his lesson, but is well aware that he deserves to pay the price for his crime. As he wrote to the Court:

> Though my incarceration has been extremely difficult, it has given me time to reflect on the moral aspects of what I've done. It has been at times demoralizing, however I also am looking at this time of tribulation as an opportunity to put this offense behind me. Carrying it in my mind for the last years has not been easy.

Ex. A. Mr. Kalonji stands before the Court as a man who has learned the price of illegality, an appreciation and admittance that what he did was wrong, as well as the value of life.

Further, we submit that Mr. Kalonji is a low risk for recidivism. Mr. Kalonji demonstrated in the four years between the cessation of the conspiracy and his arrest that he is a law abiding citizen and a productive and giving member of society. Mr. Kalonji has also provided for the Court reasons why he would not commit these crimes, or any other, again. Specifically he said:

> Knowing the potential harm to the victims, as well as the negative impact that this has had on my life and reputation, has reaffirmed my decision that I would never compromise my values and put myself and or my family through something like this ever again. I am truly sorry for what I have done.

Ex. A. Mr. Kalonji does not want to lose more time on his life and bring more embarrassment to his family. The public will not gain from giving Mr. Kalonji a long prison sentence. With his acquisition of credit cards and his work history and philanthropy since gaining refugee status in Canada, Mr. Kalonji has taken steps toward guaranteeing he will best use the opportunities

18

presented to him upon release. Indeed, Mr. Kalonji's self-motivated rehabilitation mirrors the

behavior of the defendant in *U.S. v. Gall*, 128 S.Ct. 586 (2007), where the Supreme Court found

that a below Guidelines range sentence was justified because of the "dramatic contrast between

[the defendant's] behavior before he joined the conspiracy and his conduct after withdrawing."

*Gall*, 128 S.Ct. at 601. The Court focused on the fact that the defendant was young and

immature at the time of the offense, nearly four years before he was arrested, but that his later

behavior – in attending college and gaining employment – showed that he had matured and

"would not engage in such impetuous and ill-considered conduct in the future." *Id.* Likewise,

Mr. Kalonji was young, immature, and vulnerable at the time of the offense. But in the four

years that passed between the commission of the offense and his arrest, Mr. Kalonji acquired his

high school degree and was gainfully employed. Like in *Gall*, his immaturity at the time of the

offense and subsequent growth warrants a sentence below the Guidelines range.

C.   **The Court Should Find that a Lesser Sentence Avoids Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

Section 3553(a) calls for the Court to consider, *inter alia*, the need to avoid sentence

discrepancies among defendants with similar records who have been found guilty of similar

conduct. In applying this factor to his offense, and considering his history and characteristics,

we respectfully submit that the balance of these factors counsel the Court to sentence Mr. Kalonji

leniently.

Mr. Kalonji should be given a similar sentence to Mr. Abidom Wahab, one of Mr.

Kalonji's co-conspirators, because Mr. Kalonji's role in the ring was similar to Mr. Wahab's. As

§3553(a) states, the sentence must be handed out in a way that would "avoid unwarranted

sentencing disparities among defendants with similar records who have been found guilty of

19

similar conduct." The government recognized that Mr. Wahab had "a relatively limited role in the scheme" as he "helped the scheme by using his email address to pass on stolen identity information to other ring members." Mr. Wahab was sentenced to 12 months and 1 day imprisonment followed by three years of supervised release. Additionally, he was subsequently ordered to pay $2,033.84 in restitution. As the government recognized that Mr. Wahab had a limited role in the scheme, Mr. Kalonji's similarly limited role qualifies him as a minor participant, and warrants a sentence reduction.

Moreover, the probation department has recommended a longer sentence for Mr. Kalonji than the one currently being served by Mr. Elekede, who masterminded the scheme and was charged with the overt act of using stolen credit card numbers to purchase telephone cards over the Internet. Notably, at the time of Mr. Elekede's arrest, he was still running the scheme *four years* after Mr. Kalonji changed his password and cut off communications with Mr. Elekede. Mr. Elekede was sentenced to 34 months, which was below the Guidelines range for his offense level of 21, which had a corresponding range of 37 to 46 months. The Court noted that "it is not the easiest thing in the world to affix the issue of loss in this case  Hearing Transcript of Lanre Elekede, Ex. B, at 6, and attributed a total loss of $200,000 and a total number of victims at 150 to Mr. Elekede. The Court then stated that consideration of the §3553(a) factors warranted non-guideline sentence to Mr. Elekede.

Aside from the history and characteristics of the offense, the Court weighed heavily the history and characteristics of the defendant. The Court emphasized that Mr. Elekede was foreign born and lost his family in Nigeria as a result of a religious massacre and that the Court would consider his "dire" personal circumstances. Ex. B at 17. Moreover, the Court granted Mr.

Elekede more leniency than the government offered based on the fact that he accepted responsibility for his actions.  Ex. B at 12.

Mr. Kalonji is indisputably a lesser offender than Mr. Elekede, yet has received a recommended sentence longer than Mr. Elekede.  The government has only shown evidence that Mr. Kalonji can be tied to fourteen emails – far fewer than were attributed to Mr. Elekede – and has not shown that Mr. Kalonji was any more than peripherally involved with the scheme.  He had a minimal role in the acquisition of the information and had no role in the purchase of the phone cards.  Moreover, similar to Mr. Elekede, Mr. Kalonji has an extremely dire personal history.  Mr. Kalonji is not the same level of offender that Mr. Elekede was and we implore this Court to award a sentence correspondent with Mr. Kalonji's role to avoid any sentencing disparities among the defendants in this matter.

## Conclusion

For the foregoing reasons, we respectfully request that the Court impose a sentence of time served.

Dated: New York, NY
February 5, 2009

Respectfully submitted,

DLA Piper US LLP

By:   /s/ Patrick J. Smith
Patrick J. Smith
Corey E. Delaney
Chandana T. Ravindranath
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500

Attorneys for Defendant

21